IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MORGAN MESI,<br><br>    **Plaintiff,**<br><br>      v.<br><br>**TENZING WINE & SPIRITS LLC;<br>BREAKTHRU BEVERAGE ILLINOIS,<br>LLC; LIQUOR & WINE SALES<br>REPRESENTATIVES, WAREHOUSEMEN,<br>CLERICAL, DISTILLERY, RECTIFYING,<br>TIRE, PLASTIC AND ALLIED WORKERS'<br>UNION, LOCAL NO. 3; LOCAL 3 LIQUOR<br>AND ALLIED WORKERS SALES DIVISION<br>HEALTH AND WELFARE FUND; AND<br>TRUSTEES OF THE LOCAL 3 LIQUOR<br>AND ALLIED WORKERS SALES DIVISION<br>HEALTH AND WELFARE FUND,**<br><br>    **Defendants.** | Case No.<br><br><br>**JURY DEMANDED** |

## COMPLAINT

Plaintiff Morgan Mesi, by and through his attorneys, Hughes Socol Piers Resnick & Dym, Ltd., complains against Defendants Tenzing Wine & Spirits, LLC; Breakthru Beverage Illinois, LLC; Liquor & Wine Sales Representatives, Warehousemen, Clerical, Distillery, Rectifying, Tire, Plastic and Allied Workers' Union, Local No. 3; Local 3 Liquor and Allied Workers Sales Division Health and Welfare Fund; and the Trustees of the Local 3 Liquor and Allied Worker Sales Division Health and Welfare Fund (collectively, "Defendants") as follows:

## NATURE OF THE ACTION

1. Plaintiff Morgan Mesi brings this civil rights complaint against Defendants for discriminating against him because of his gender identity as a transgender person. Defendants are

1

Mr. Mesi's former employers, labor union, healthcare plan, and healthcare plan trustees, who collectively provided healthcare benefits to Mr. Mesi. Defendants discriminated against Mr. Mesi by denying him insurance coverage of critical gender-affirming healthcare, even though federal and Illinois law recognize that this discrimination is categorically illegal.

2.     Mr. Mesi is a transgender man. He has also been diagnosed with gender dysphoria, which is the clinical distress that results from an individual's gender identity not aligning with their sex assigned at birth. Left untreated, gender dysphoria can result in anxiety, depression, post-traumatic stress disorder, and is linked to a highly increased risk of suicide. When he worked for Defendants, Mr. Mesi sought gender-affirming healthcare recognized by medical experts as treatment for his diagnosed gender dysphoria, including hormone therapy and surgery.

3.     But Defendants repeatedly denied Mr. Mesi health insurance coverage for his gender-affirming care and gender dysphoria treatment. Defendants labeled his surgery request "elective," "cosmetic," like liposuction or Botox, and "not medically necessary," and therefore excluded from his health insurance coverage – even when Mr. Mesi provided extensive documentation from multiple medical professionals that this treatment was medically necessary and met the health plan criteria.

4.     Defendants' discrimination was no mistake. Defendants continued to discriminate against Mr. Mesi despite pleas for assistance, appeals, and formal complaints. Even after the federal Equal Opportunity Employment Commission ("EEOC") found that Defendants likely violated the law, Defendants still refused to pay.

5.     Because Defendants refused to cover his healthcare, Mr. Mesi was forced to pay for essential gender-affirming healthcare out-of-pocket. He incurred thousands of dollars in medical bills, financed on credit, when he had no other choice. The years-long dispute with

Defendants, the delayed, life-saving healthcare, and the traumatic search for ways to find and pay for the healthcare he needed caused Mr. Mesi significant emotional distress.

6. Defendants violated well-established federal and Illinois law that prohibits discrimination on the basis of sex, gender identity, and disability related to his diagnosis of gender dysphoria. Mr. Mesi brings claims against Defendants for violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. § 12112 *et seq.* ("ADA"), and the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101 *et seq.*

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to Title VII, 42 U.S.C. § 2000e-5(f)(3) and the Americans with Disabilities Act, 42 U.S.C. § 12117.

8. This Court also has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because the matters at issue arise under the laws of the United States.

9. Plaintiff's claims for declaratory relief are authorized by 28 U.S.C. §§ 2201 and 2202.

10. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 42 U.S.C. § 1367(a).

11. This Court has personal jurisdiction over Defendants and venue is appropriate in the Northern District of Illinois pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims, including the unlawful employment discrimination, occurred in this District. Defendants also all have offices where they conduct business in this District.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

12. Mr. Mesi has exhausted his administrative remedies and met all conditions precedent to the filing of this lawsuit.

13. Mr. Mesi timely filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") and Illinois Department of Human Rights ("IDHR").

14. After a thorough investigation, the EEOC found reasonable cause that Defendants Breakthru Beverage Illinois, LLC; Tenzing Wine & Spirits, LLC; Liquor & Wine Sales Representatives, Warehousemen, Clerical, Distillery, Rectifying, Tire, Plastic and Allied Workers' Union, Local No. 3; and Local 3 Liquor and Allied Workers Sales Division Health and Welfare Fund discriminated against Mr. Mesi based on his sex, gender identity, and disability.

15. The EEOC further concluded that there was reasonable cause that the same Defendants maintained a health insurance policy that, since at least October 2016, excluded and refused to pay for medical treatment based on sex and disability, including gender-affirming surgery and hormone therapy, in violation of Title VII and the ADA.

16. The EEOC released Mr. Mesi's claims and issued Mr. Mesi notices of his right to sue for all Defendants on September 25, 2023 and September 28, 2023. Mr. Mesi exhausted his administrative remedies and timely filed this lawsuit.

**PARTIES**

17. Plaintiff Morgan Mesi ("Mr. Mesi") is a 34-year-old transgender man who lives in Chicago, Illinois. Mr. Mesi was employed as a Sales Guide for Defendants Tenzing Wine & Spirits, LLC ("Tenzing") and Breakthru Beverage Illinois, LLC ("Breakthru") in the Chicagoland area, from about September 2015 through about March 2019. While employed by Defendants Tenzing and Breakthru, Mr. Mesi was also an active, dues-paying member of the Liquor & Wine

4

Sales Representatives, Warehousemen, Clerical, Distillery, Rectifying, Tire, Plastic and Allied Workers' Union, Local No. 3 ("the Union") and a member of the Local 3 Liquor and Allied Workers Sales Division Health and Welfare Fund healthcare insurance plan.

18.     Defendant Tenzing Wine & Spirits, LLC is an Illinois limited liability company that conducts business in Illinois and has an office in Chicago, Illinois. During the relevant time period, Tenzing had approximately 30 full-time employees and was Mr. Mesi's employer from about September 2015 through March 2019.  Defendant Breakthru is the sole owner of and controls Tenzing.

19.     Defendant Breakthru Beverage Illinois, LLC is a Delaware limited liability company that conducts business in Illinois and has an office in Cook County, Illinois. Breakthru has several thousand employees and was Mr. Mesi's joint employer from about September 2015 through March 2019.[1] Breakthru is the sole manager of Tenzing. Breakthru set terms and conditions of Mr. Mesi's employment and bargained with the Union to determine the employment benefits and terms of the collective bargaining agreement ("CBA") that governed Mr. Mesi's and other Tenzing employees' employment, including healthcare benefits. The CBA was agreed to and entered into by Breakthru and the Union.

20.     Defendant Liquor & Wine Sales Representatives, Warehousemen, Clerical, Distillery, Rectifying, Tire, Plastic and Allied Workers' Union, Local No. 3 is a national labor organization that represents hundreds of members in Illinois and the Chicagoland area, including members like Mr. Mesi who specialize in liquor and wine sales. The Union has an office in Cook County, Illinois and conducts business in Illinois. Mr. Mesi was a member of the Sales Division of the Union throughout his employment with Tenzing and Breakthru.

---

[1] Breakthru boasts "more than 9,000 employees across [it's] footprint." *See* Breakthru Beverage Group, *Locations*, https://www.breakthrubev.com/Locations (last visited Dec. 12, 2023).

21.     Defendant Local 3 Liquor and Allied Workers Sales Division Health and Welfare Fund (the "Union Health and Welfare Fund") provides healthcare benefits through the welfare benefit plan it established and maintained, the Local 3 Liquor and Allied Workers Sales Division Health and Welfare Plan (the "Union Plan"). The Union Plan was available to eligible union members like Mr. Mesi and their dependents. The Union Health and Welfare Fund has an office in Chicago, Illinois and conducts business in Illinois. On information and belief, the Union did not offer its Sales Division members, and Defendants Tenzing and Breakthru did not offer its Sales Guide employees, any other options for healthcare benefits other than through the Union Plan that the Union Health and Welfare Fund administered.

22.     Defendant Trustees of the Local 3 Liquor and Allied Worker Sales Division Health and Welfare Fund ("the Trustees") administered the Union Plan and have an office in Chicago, Illinois. During the relevant time period, the Trustees were comprised of Patrick G. Duff, Sr., Patrick G. Duff, Terrence Brick, and Karin Lijana Matura. Defendants Patrick G. Duff, Sr. and Patrick G. Duff served as Union representatives for the Trustees and Defendants Terrence Brick and Karin Lijana Matura served as employer representatives for the Trustees. The employer representatives were appointed by employers bound by a Trust Agreement that the employers, including Breakthru, entered into with the Union.

## FACTUAL ALLEGATIONS

### Gender Identity and Gender Dysphoria

23.     A person's sex is often based on a number of physical factors, including anatomy, genetics, and hormones. An individual is typically assigned a sex at birth based on specific physical characteristics.

6

24.     Gender identity, however, is based on a person's *internal* sense of their own sex—whether male, female, non-binary, or gender fluid.[2]

25.     Cisgender individuals have a gender identity that aligns, in a traditional sense, with the sex they were assigned at birth. Individuals who identify as transgender, however, have a gender identity that does not align, in a traditional sense, with the sex they were assigned at birth.[3]

26.     Individuals who identify as transgender may experience gender dysphoria but a formal diagnosis of gender dysphoria requires more than identifying as a transgender person. A diagnosis requires "clinically significant distress of impairment in social, occupational, or other important areas of function." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 452-43 (5th ed. 2013).

27.     The World Professional Association for Transgender Health ("WPATH") promulgates Standards of Care for individuals who are transgender. National medical organizations, including the American Medical Association and American Psychiatric Association, recognize the WPATH standards as authoritative for treating gender dysphoria.

28.     Under WPATH's Standards of Care, medically necessary treatment for gender dysphoria may include mental health counseling, gender-affirming hormone therapy, and gender-affirming surgeries.[4]

---

[2] *Definitions of Gender, Sex, and Sexual Orientation and Pronoun Usage,* AM. PSYCHIATRIC ASS'N*,* https://www.psychiatry.org/psychiatrists/diversity/education/transgender-and-gender-nonconforming-patients/definitions-and-pronoun-usage (last visited Dec. 12, 2023).

[3] *What is Gender Dysphoria?,* AM. PSYCHIATRIC ASS'N, https://www.psychiatry.org/patients-families/gender-dysphoria/what-is-gender-dysphoria (last visited Dec. 12, 2023).

[4] Eli Coleman, et al., *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People*, *Version 7*, WORLD PROF'L ASS'N FOR TRANSGENDER HEALTH (2012), https://www.wpath.org/media/cms/Documents/SOC%20v7/SOC%20V7_English.pdf. *See also* E. Coleman, et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, World Prof'l Ass'n for Transgender Health (Sept. 15, 2022), https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644.

29. Gender-affirming medical care is crucial and necessary. It has been shown to significantly lower rates of attempted suicide, depression, anxiety, substance use, and harmful self-prescribed hormone use for individuals experiencing gender dysphoria.[5]

30. Leading medical organizations have recognized and emphasized the importance of gender-affirming care as medically necessary, including the American Medical Association, Endocrine Society, American Psychiatric Association, the World Health Organization, and The Journal of the American Medical Association, among many others.[6] As the American Medical Association advises, "[e]very major medical association in the United States recognizes the medical necessity of transition-related care for improving the physical and mental health of transgender people."[7]

31. Consistent with this direction from the medical community, courts have repeatedly recognized that gender-affirming care, including surgery, is medically necessary and not "elective" or "cosmetic." *See, e.g., Flack v. Wisconsin Dep't of Health Services*, 331 F.R.D. 361, 371 (W.D. Wis. 2019) ("As the court previously recognized, the larger medical community considers gender-confirming treatments – including surgery—to be valid aspects of medical care"); *Kadel v. Folwell,* 620 F. Supp. 3d 339, 392 (M.D.N.C. 2022) ("Plaintiffs' doctors, their experts, every major medical association, and Defendants' own third-party administrators all agree that, in certain cases, gender affirming medical and surgical care can be medically necessary to treat gender dysphoria"); *Fain v. Crouch*, 618 F.

---

[5] *Advocating for the LGBTQ community*, AM. MED. ASS'N, https://www.ama-assn.org/delivering-care/population-care/advocating-lgbtq-community (last visited Dec. 12, 2023).

[6] *Medical Association Statements in Support of Health Care for Transgender People and Youth*, GLAAD (June 21, 2023), https://glaad.org/medical-association-statements-supporting-trans-youth-healthcare-and-against-discriminatory/.

[7] *AMA to states: Stop interfering in health care of transgender children*, AM. MED. ASS'N (Apr. 26, 2021), https://www.ama-assn.org/press-center/press-releases/ama-states-stop-interfering-health-care-transgender-children.

Supp. 3d 313, 330 (S.D.W. Va. 2022), *appeal filed,* (No. 22-1927) ("The argument that surgical treatment of gender dysphoria is not medically necessary is wholly unsupported by the record, and importantly, is refuted by the majority of the medical community"); *Hicklin v. Precynthe*, No. 4:16-cv-01357-NCC, 2018 WL 806764 (E.D. Mo. Feb. 9, 2018) (summarizing case law in which courts determined gender-affirming health benefits were not cosmetic and were medically necessary).

**Mr. Mesi's Employment and Health Insurance Benefits**

32.     Mr. Mesi applied for a job as a Sales Guide in the beverage distribution industry with Defendant Tenzing around August 2015. Tenzing recruited candidates by advertising that the position included healthcare benefits.

33.     Mr. Mesi received and accepted a job offer in or around September 2015, formalized in an offer letter on Tenzing letterhead and sent by a Talent Acquisition Recruiter with Wirtz Beverage Illinois (Wirtz became Breakthru around 2016).

34.     The offer letter stated that compensation and benefits would be provided "[p]er [the] Union Contract (Local 3)" and that "Tenzing's benefits, policies, and procedures may be revised or discontinued by Tenzing at any time, in its sole discretion."

35.     Mr. Mesi's employment began with training by Breakthru and Tenzing, along with representatives from the Union. Breakthru directed Mr. Mesi to complete new-hire tasks, conducted Mr. Mesi's background check, and provided Mr. Mesi with supplies to do his job, including an iPad.

36.     Shortly after Mr. Mesi began his employment, around October 2015, he became a member of the Union. Certain terms and conditions of Mr. Mesi's employment were governed by the CBA, to which Breakthru and the Union were parties and had negotiated.

9

37. On information and belief, Breakthru agreed to the CBA with the Union on behalf of Tenzing.

38. The CBA included terms about the Union Health and Welfare Fund and the Union Plan, including that "the employer" was required to contribute a specified amount to the Health and Welfare Fund each month and for each eligible employee. On information and belief, "the employer" referred to Breakthru.

39. Breakthru, Tenzing, and the Union provided health insurance to eligible members through the Union Plan, which was administered by the Union Health and Welfare Fund Trustees.

40. The Union Plan provided comprehensive coverage for a wide range of non-occupational health services but expressly excluded coverage for certain medical treatments, including "cosmetic surgery" and services that the Trustees deemed not "medically necessary."

41. The Union Plan defined medically necessary as:

> those health services which are determined by the Plan to be medically appropriate and (a) necessary to meet the basic needs of the covered person, (b) rendered in the cost-efficient manner and type of setting appropriate for the delivery of health services, (c) consistent in type, frequency, and duration of treatment with scientifically based guidelines of national medical research and health care coverage organizations and government agencies that are accepted by the Plan, (d) consistent with the diagnosis of the condition, (e) required for reasons other than the comfort or convenience of the covered person or his or her physician and (f) of demonstrated medical value as demonstrated through peer-reviewed medical literature.

42. The Union Plan expressly provided coverage for reconstructive surgery following a mastectomy.

43. The Union Plan was administered by four Trustees who, during the relevant time period, included two Union representatives, Patrick G. Duff, Sr. and Patrick G. Duff, and two employer representatives, Terrence Brick and Karin Lijana Matura. Patrick G. Duff is the president of the Union. The employer representatives were appointed by employers bound by a "Trust

10

Agreement," which, on information and belief, was entered between the Union and employers, including Breakthru and Tenzing.

### Defendants' Discriminatory Denial of Mr. Mesi's Medically Necessary Gender-Affirming Care

44. Mr. Mesi pursued gender-affirming healthcare for approximately two years. Around September 2016, Mr. Mesi was diagnosed with gender dysphoria because the sex he was assigned at birth (female) did not align with his gender identity.

45. The gender dysphoria that Mr. Mesi experienced caused him clinically significant distress that substantially limited major life activities, including working, concentrating, sleeping, and thinking.

46. Mr. Mesi began the process of seeking treatment from mental health professionals for his gender dysphoria around November 2016.

47. Nearly a year later, around September 2017, Mr. Mesi sought additional medical treatment for his gender dysphoria, including (1) surgery, such as a bilateral mastectomy and corresponding breast reconstruction, and (2) hormone therapy. Mr. Mesi's treating healthcare providers determined that both treatments were medically necessary for Mr. Mesi's gender dysphoria.

### *Defendants Wrongfully Denied Mr. Mesi's Medically Necessary Surgery*

48. Gender-affirming surgery has stringent presurgical requirements. Consistent with WPATH guidelines, Mr. Mesi engaged in long-term treatment and assessment by mental health professionals, obtained written documentation from treating therapists showing his readiness for surgery, and had a medical evaluation.

49. After investing the time, money, and personal resources to fulfill these requirements, around November 2017, Mr. Mesi scheduled a consultation with a surgeon regarded

as a national expert on gender affirmation surgery. Mr. Mesi scheduled the consultation to discuss surgical treatment for gender dysphoria, including a bilateral mastectomy and breast reconstruction. Mr. Mesi's clinical psychologist submitted a letter of support to the surgeon, recommending the surgery because of Mr. Mesi's active gender dysphoria. The letter also stated that Mr. Mesi was in regular therapy to manage his symptoms and develop a stronger sense of self and that Mr. Mesi demonstrated the necessary eligibility and readiness requirements for accessing medical interventions for gender-affirming care.

50. At the consultation, the surgeon determined Mr. Mesi met the criteria for surgery. Around January 2018, the surgeon's office submitted a pre-approval request to the Union Plan for coverage of the surgery.

51. About two months later, on March 5, 2018, Mr. Mesi received a "Plan Exclusion Notice." The Plan Exclusion Notice stated that Mr. Mesi's request for surgery was not covered by the Union Plan and was therefore denied.

52. Around August 2018, Mr. Mesi spoke with the Plan about the denial of his surgery request. The representative told Mr. Mesi that he had a document from the Union directing the denial of Mr. Mesi's request for coverage. The representative further stated that the coverage request for Mr. Mesi's surgery was denied because the gender-affirming surgery was excluded from coverage under the Union Plan as "cosmetic surgery."

53. The Union Plan defined "cosmetic" as "procedures or services that affect *appearance only*, or which are performed for a *purely superficial* benefit," (emphasis added), and defined "cosmetic surgery" as "an elective surgical procedure."

54. Mr. Mesi, who had been living openly at work as a transgender person since about July 2018, was devastated by the surgery denial. By the time he sought the treatment, his gender

12

dysphoria caused him to suffer regular suicidal thoughts. He questioned whether he could live in a body that caused him so much turmoil and pain.  Mr. Mesi viewed the surgery as a matter of life and death.

55.     On September 8, 2018, Mr. Mesi appealed the denial of his surgery request and included letters of support from his physician and two licensed mental health professionals (Mr. Mesi's treating clinical psychologist and clinical social worker) that confirmed that the procedure was medically necessary to treat Mr. Mesi's gender dysphoria.

56.     These letters specifically confirmed that the requested surgery was treatment for gender dysphoria, that Mr. Mesi "satisfied the WPATH standards of care," that Mr. Mesi's gender dysphoria remained active, and that, "[g]ender dysphoria is a serious medical condition, and a substantial body of research shows that its treatment is medically necessary and effective. Accordingly, there is no medical justification for a contract exclusion for its coverage."

57.     Less than a month later, on September 28, 2018, Mr. Mesi received a denial of his appeal. The Trustees had reviewed Mr. Mesi's appeal request and "denied [his] appeal for benefits for a proposed elective mastectomy." The Trustees decided the following:

> Our medical plan's benefits for mastectomy, in situations in which the patient does not have cancer or a similar disease, require a family history of cancer of a close relative (mother, daughter, sister). Your appeal does not show these circumstances to be present, and therefore the services are not deemed medically necessary under [the plan].

The appeal denial was signed by Vincent R. Vidmer, an attorney representing the Union Health and Welfare Fund and the Trustees.

58.     When Mr. Mesi's initial surgery request was denied, he contacted the Union for assistance with the coverage denial. However, the Union did not provide any meaningful response, assist Mr. Mesi with the coverage determination or the appeal, or suggest any avenue for resolution other than the Plan's procedures, and flatly stopped responding to him and answering his calls.

59. After Mr. Mesi received the appeal denial, he directly emailed Henry Duff, an employee of the Union and nephew of Patrick G. Duff, the Union president, to request assistance with the denial, which Mr. Mesi viewed as discriminatory and improper. Henry responded to Mr. Mesi that the Union could not intervene and that the Trustees had made their decision.

60. Because Defendants refused to cover his necessary medical care, in February 2019, Mr. Mesi was forced to proceed with his mastectomy and related follow-up care by paying out-of-pocket. Mr. Mesi put thousands of dollars of these medically necessary expenses on credit. While the Union Health and Welfare Fund had covered some of Mr. Mesi's doctor visits prior to the denial, it stopped covering those doctor visits when it determined that the underlying purpose of those visits was for Mr. Mesi's gender-affirming care.

61. Mr. Mesi used all his sick leave and took additional unpaid leave for about 2-3 weeks to recover from the surgery.

62. Mr. Mesi would have scheduled additional follow-up care and treatment after the surgery, but he could not afford to do so because of the out-of-pocket expenses for which he had been paying.

### *Defendants Wrongfully Denied Mr. Mesi's Medically Necessary Hormone Therapy*

63. Along with seeking surgical treatment and consistent with his treating healthcare professionals' medical advice, Mr. Mesi also sought hormone therapy around June 2018 as another component of gender-affirming care. Mr. Mesi contacted the Plan about coverage for hormone therapy.

64. The Plan's representative informed Mr. Mesi that hormone therapy for gender-affirming care was not covered under the Union Plan, even if he provided documentation from his medical providers that hormone therapy was medically necessary.

65. Thus, the Union Health and Welfare Fund consistently excluded coverage for gender-affirming care, regardless of medical necessity, for both prescription medication and surgical treatment.

66. Because of this denial, Mr. Mesi was forced to pay for his prescribed hormone therapy out-of-pocket and on credit.

67. Defendants collectively provided healthcare benefits that denied critical medical treatment to Mr. Mesi for discriminatory reasons. By excluding Mr. Mesi's medically necessary gender-affirming healthcare as "elective" and denying coverage from the only health plan available to him through Tenzing, Breakthru, and the Union, Defendants unlawfully discriminated against Mr. Mesi because of his gender identity and gender dysphoria disability.

## CLAIMS FOR RELIEF

**COUNT I**
**Violation of Title VII of the Civil Rights Act of 1964**
**42  U.S.C. § 2000e *et seq.***
***(Against All Defendants)***

68. Plaintiff restates and realleges the foregoing paragraphs as if fully stated and alleged herein.

69. Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).

70. The United States Supreme Court has held that sex discrimination in violation of Title VII includes discrimination based on a person's gender identity. *Bostock v. Clayton County*, 590 U.S. ___ (2020).

71. An employer- and union-sponsored healthcare plan is part of the "compensation, terms, conditions, or privileges of employment." *See Arizona Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris*, 463 U.S. 1073, 1089 (1983).

72. Defendants Tenzing and Breakthru were Mr. Mesi's employers as defined by Title VII. 42 U.S.C. § 2000e(b). Tenzing and Breakthru provided health insurance benefits to Mr. Mesi, as an employee, through the Union and the Fund. Breakthru, on behalf of Tenzing, bargained for the terms of the CBA, and ultimately agreed to the CBA, with the Union. The CBA provided for administration of employees' and Union members' health insurance benefits.

73. The health insurance provided to Mr. Mesi, as Tenzing and Breakthru's employee, and as bargained for by Breakthru, discriminated against him because of his gender identity as a transgender person.

74. Title VII defines employers to include "any agent" of employers. 42 U.S.C. § 2000e.

75. The Union, Union Health and Welfare Fund, and Union Trustees served as Tenzing and Breakthru's agent in its provision of healthcare benefits. Tenzing and Breakthru delegated significant authority and control to the Union, Union Health and Welfare Fund, and Union Trustees to administer Mr. Mesi's health insurance benefits. The Union Health and Welfare Fund and Trustees exercised their authority to make healthcare coverage determinations and interpret the terms of the Union Plan. The Trustees, representing the Union Health and Welfare Fund and including two Union representatives and two employer representatives, denied Mr. Mesi's September 2018 appeal seeking insurance coverage for his medically necessary surgery because of his gender identity.

16

76.     Title VII also prohibits "a labor organization . . . [from] otherwise discriminat[ing] against, any individual because of his race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(c)(1), or "to cause or attempt to cause an employer to discriminate against an individual," 42 U.S.C. § 2000e-2(c).

77.     The Union is a "labor organization" as defined by Title VII. 42 U.S.C. § 2000e(d).

78.     As detailed above, Mr. Mesi repeatedly notified the Union of the Union Health and Welfare Fund and Union Trustees' decisions to deny coverage of gender-affirming healthcare. Nevertheless, the Union did not take action to address the discriminatory provision of benefits. The Union continued to provide healthcare benefits that denied coverage because of Mr. Mesi's gender identity.

79.     As detailed above, Defendants discriminated against Mr. Mesi by repeatedly denying him coverage of medically necessary treatment based on his gender identity and, therefore, his sex.

80.     As a direct result of Defendants' discrimination, Mr. Mesi is entitled to compensatory damages, including emotional distress and medical expenses, attorney's fees and costs, and pre-judgment interest.

81.     Mr. Mesi is also entitled to punitive damages, as Defendants discriminated against Mr. Mesi with malice or reckless indifference to Mr. Mesi's federally protected rights.

82.     As detailed above, Mr. Mesi has exhausted his administrative remedies and timely filed this claim against Defendants.

17

**COUNT II**
**Violation of the Americans with Disabilities Act**
**42 U.S.C. § 12112 *et seq.***
**(Against All Defendants)**

83.     Plaintiff restates and realleges the foregoing paragraphs as if fully stated and alleged herein.

84.     The ADA provides that, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

85.     An employer- and union-sponsored healthcare plan is part of the "compensation . . . and other terms, conditions, and privileges of employment.

86.     The ADA further specifies that discriminating against a qualified individual on the basis of a disability includes, "participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter (such relationship includes a relationship with a . . . labor union, [or] an organization providing fringe benefits to an employee of the covered entity. . .)," and "utilizing standards, criteria, or methods of administration . . . that have the effect of discrimination on the basis of disability." 42 U.S.C. § 12112(b).

87.     Mr. Mesi is a qualified individual as defined by the ADA, 42 U.S.C. §§ 12111(8), 12102.  As detailed above, he experienced and was diagnosed with gender dysphoria, which required "clinically significant distress of impairment in social, occupational, or other important areas of function." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 452-43 (5th ed. 2013). Mr. Mesi's gender dysphoria diagnosis was based on his distress that substantially limited major life activities, including working, concentrating, sleeping, and thinking.

18

88.     Defendants Tenzing and Breakthru were Mr. Mesi's employers as defined by the ADA and are therefore covered entities. *See* 42 U.S.C. § 12111(5); 42 U.S.C. § 12111(2).

89.     Tenzing and Breakthru provided health insurance benefits to Mr. Mesi, as an employee, through the Union and the Fund. Breakthru, on behalf of Tenzing, bargained for the terms of the CBA, and ultimately agreed to the CBA, with the Union. The CBA provided for administration of employees' and Union members' health insurance benefits. The health insurance provided to Mr. Mesi, as Tenzing and Breakthru's employee, and as bargained for by Breakthru, discriminated against him because of his gender dysphoria disability.

90.     The Union is a labor organization as defined by the ADA and, therefore, a covered entity. *See* 42 U.S.C. § 12111(2); 42 U.S.C. § 12111(7); 42 U.S.C. § 2000e(d). As detailed above, Mr. Mesi repeatedly notified the Union of the Union Health and Welfare Fund and Union Trustees' decisions to deny coverage of gender-affirming healthcare as treatment for his gender dysphoria. Nevertheless, the Union did not take action to address the discriminatory provision of benefits. The Union continued to provide healthcare benefits that denied coverage based on Mr. Mesi's gender dysphoria disability.

91.     The ADA defines employers to include "any agent" of employers, 42 U.S.C. § 12111(5), and labor organizations to include "any agent" of labor organizations. *See* 42 U.S.C. § 12111(2); 42 U.S.C. § 12111(7); 42 U.S.C. § 2000e(d).

92.     The Union Health and Welfare Fund and Union Trustees are agents of Tenzing, Breakthru, and the Union, and are therefore covered entities as defined by the ADA.

93.     Tenzing and Breakthru delegated significant authority and control to the Union, Union Health and Welfare Fund, and Union Trustees to administer Mr. Mesi's health insurance benefits. The Union Health and Welfare Fund and Trustees exercised their authority to make

healthcare coverage determinations and interpret the terms of the Union Plan. The Trustees, representing the Union Health and Welfare Fund and including two Union representatives and two employer representatives, denied Mr. Mesi's September 2018 appeal seeking insurance coverage for his medically necessary surgery because of his gender dysphoria disability.

94. As detailed above, Defendants discriminated against Mr. Mesi by repeatedly denying coverage of medically necessary treatment based on his gender dysphoria and, therefore, his disability.

95. As a direct result of Defendants' discrimination, Mr. Mesi is entitled to compensatory damages, including emotional distress and medical expenses, attorney's fees and costs, and pre-judgment interest.

96. As detailed above, Mr. Mesi has exhausted his administrative remedies and timely filed this claim against Defendants.

**COUNT III**
**Violation of the Illinois Human Rights Act – Gender Identity Discrimination**
**775 ILCS 5/1-101 *et seq.***
***(Against All Defendants)***

97. Plaintiff restates and realleges the foregoing paragraphs as if fully stated and alleged herein.

98. The IHRA states that "[i]t is a civil rights violation . . . [f]or any employer to . . . act with respect to . . . privileges or conditions of employment on the basis of unlawful discrimination." 775 ILCS 5/2-102(A).

99. "Unlawful discrimination" includes "discrimination against a person because of his or her actual or perceived . . . sex" or "gender-related identity, whether or not traditionally associated with the person's designated sex at birth." 775 ILCS 5/1-103(O-1), Q.

100.    An employer- and union-sponsored healthcare plan is part of the "privileges or conditions of employment."

101.    Defendants Tenzing and Breakthru were Mr. Mesi's employers as defined by the IHRA. 775 ILCS 5/2-101(B).

102.    Tenzing and Breakthru provided health insurance benefits to Mr. Mesi, as an employee, through the Union and the Fund. Breakthru, on behalf of Tenzing, bargained for the terms of the CBA, and ultimately agreed to the CBA, with the Union. The CBA provided for the administration of employees' and Union members' health insurance benefits. The health insurance provided to Mr. Mesi, as Tenzing and Breakthru's employee, and as bargained for by Breakthru, discriminated against him because of his gender identity as a transgender person.

103.    The IHRA also states that, "[i]t is a civil rights violation . . . [f]or any labor organization. . . to take, or fail to take, any action which affects adversely any person's . . . wages, tenure, hours of employment or apprenticeship conditions on the basis of unlawful discrimination." 775 ILCS 5/2-102(C).

104.    An employer- and union-sponsored healthcare plan is part of the "wages, tenure, hours of employment or apprenticeship conditions."

105.    The Union is a labor organization, and the Union Health and Welfare Fund and Trustees are labor union-affiliated organizations, as defined by the IHRA. 775 ILCS 5/2-101(D); 775 ILCS 5/1-103(L). As detailed above, Mr. Mesi repeatedly notified the Union of the Union Health and Welfare Fund and Union Trustees' decisions to deny him gender-affirming healthcare. Nevertheless, the Union did not take action to address the discriminatory provision of benefits. The Union continued to provide healthcare benefits that denied coverage based on Mr. Mesi's

gender identity as a transgender person and thus discriminated against him on the basis of gender identity.

106. The Union Health and Welfare Fund and Trustees exercised their authority to make healthcare coverage determinations and interpret the terms of the Union Plan. The Trustees, representing the Union Health and Welfare Fund and including two Union representatives and two employer representatives, denied Mr. Mesi's September 2018 appeal seeking insurance coverage for his medically necessary surgery because of his gender identity.

107. The IHRA also prohibits aiding and abetting a person in committing a violation of the Act. 775 ILCS 5/6-101. The Union, Union Health and Welfare Fund, and Trustees aided and abetted Breakthru and Tenzing in discriminating against Mr. Mesi in violation of the Act based on his gender identity.

108. As detailed above, Defendants discriminated against Mr. Mesi by repeatedly denying him coverage of medically necessary treatment based on his gender identity, even after he submitted supporting documentation from medical providers establishing that the treatment was medically necessary.

109. As a direct result of Defendants' discrimination, Mr. Mesi is entitled to compensatory damages, including emotional distress and medical expenses, punitive damages for Defendants' intentional discrimination, attorney's fees and costs, and pre-judgment interest.

110. As detailed above, Mr. Mesi has exhausted his administrative remedies and timely filed this claim against Defendants.

**COUNT IV**
**Violation of the Illinois Human Rights Act – Disability Discrimination**
**775 ILCS 5/1-101 *et seq.***
***(Against All Defendants)***

111.    Plaintiff restates and realleges the foregoing paragraphs as if fully stated and alleged herein.

112.    The IHRA prohibits discrimination on the basis of a person's physical or mental disability. 775 ILCS 5/1-103(I). The IHRA states that, "[i]t is a civil rights violation . . . [f]or an employer to . . . act with respect to . . . privileges or conditions of employment on the basis of unlawful discrimination" and unlawful discrimination includes a person's actual or perceived disability.  *See* 775 ILCS 5/2-102(A); 775 ILCS 5/1-103.

113.    An employer- and union-sponsored healthcare plan is part of the "privileges of or conditions of employment."

114.    Mr. Mesi is an individual with a disability because, as detailed above, he experienced and was diagnosed with gender dysphoria, which required "clinically significant distress of impairment in social, occupational, or other important areas of function." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 452-43 (5th ed. 2013). Mr. Mesi's gender dysphoria diagnosis was based on his distress that substantially limited major life activities, including working, concentrating, sleeping, and thinking, and his diagnosis thus falls within the definition of a disability under the IHRA. *See* 775 ILCS 5/1-103(I).

115.    Defendants Tenzing and Breakthru were Mr. Mesi's employers as defined by the IHRA. 775 ILCS 5/2-101(B).

116.    Tenzing and Breakthru provided health insurance benefits to Mr. Mesi, as an employee, through the Union and the Fund. Breakthru, on behalf of Tenzing, bargained for the terms of the CBA, and ultimately agreed to the CBA, with the Union. The CBA provided for the

administration of employees' and Union members' health insurance benefits. The health insurance provided to Mr. Mesi, as Tenzing and Breakthru's employee, and as bargained for by Breakthru, discriminated against him because of his gender dysphoria disability.

117. The IHRA also states that, "[i]t is a civil rights violation . . . [f]or any labor organization. . . otherwise to take, or fail to take, any action which affects adversely any person's . . . wages, tenure, hours of employment or apprenticeship conditions on the basis of unlawful discrimination." 775 ILCS 5/2-102(C).

118. An employer- and union-sponsored healthcare plan is part of the "wages, tenure, hours of employment or apprenticeship conditions."

119. The Union is a labor organization, and the Union Health and Welfare Fund and Trustees are labor union-affiliated organizations, as defined by the IHRA. 775 ILCS 5/2-101(D); 775 ILCS 5/1-103(L). As detailed above, Mr. Mesi repeatedly notified the Union of the Union Health and Welfare Fund and Union Trustees' decisions to deny him coverage of medically necessary gender-affirming healthcare as treatment for his gender dysphoria. Nevertheless, the Union did not take action to address the discriminatory provision of benefits. The Union continued to provide healthcare benefits that denied coverage based on Mr. Mesi's gender dysphoria and thus discriminated against him because of his disability.

120. The Union Health and Welfare Fund and Trustees exercised their authority to make healthcare coverage determinations and interpret the terms of the Union Plan. The Trustees, representing the Union Health and Welfare Fund and including two Union representatives and two employer representatives, denied Mr. Mesi's September 2018 appeal seeking insurance coverage for his medically necessary surgery because of his gender dysphoria disability.

24

121. The IHRA also prohibits aiding and abetting a person in committing a violation of the Act. 775 ILCS 5/6-101. The Union, Union Health and Welfare Fund, and Trustees aided and abetted Breakthru and Tenzing in discriminating against Mr. Mesi in violation of the Act based on his gender dysphoria disability.

122. As detailed above, Defendants discriminated against Mr. Mesi by repeatedly denying coverage for his medically necessary treatment based on his gender dysphoria and, therefore, his disability.

123. As a direct result of Defendants' discrimination, Mr. Mesi is entitled to compensatory damages, including emotional distress and medical expenses, attorney's fees and costs, and pre-judgment interest.

124. As detailed above, Mr. Mesi has exhausted his administrative remedies and timely filed this claim against Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

A. Declaratory relief, including but not limited to, a declaration that Defendants violated Title VII, the ADA, and the IHRA;

B. An award of damages to compensate Mr. Mesi for his injuries, including, but not limited to, his out-of-pocket expenses for his gender-affirming medical treatment and emotional distress;

C. An award of punitive damages to punish Defendants for their intentional discrimination against Mr. Mesi based on his sex and disability;

D. Reasonable attorney's fees, expert fees, and the costs and expenses of litigation;

E. All other and further relief as may be appropriate.

## JURY DEMAND

Plaintiff demands trial by jury on all issues for which a jury trial is allowed.


Dated: December 14, 2023

Respectfully submitted,

/s/ Caryn C. Lederer_____
One of Plaintiff's Attorneys

Caryn C. Lederer
Charlie Wysong
Tory Tilton
Hughes Socol Piers Resnick & Dym, Ltd.
70 W. Madison St., Suite 4000
Chicago, IL 60602
clederer@hsplegal.com
cwysong@hsplegal.com
ttilton@hsplegal.com
(312) 580-0100